IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Donald Owen Record, II, | ) C.A. NO.: 2:21-cv-3469-RMG |
| Plaintiff, | ) |
| v. | ) |
| | ) **COMPLAINT** |
| American Landmark Management, Inc. | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) |

COMES NOW, Plaintiff Donald Owen Record, II ("Plaintiff") and files this Complaint against Defendant American Landmark Management, Inc. ("Defendant"), seeking to recover damages for violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"); violations of the South Carolina Payment of Wages Act, SC Code § 41-10-10 et seq ("SCPWA"); and for common law claims for negligence per se, and wrongful termination in violation of the public policy of the State of South Carolina. In support of his Complaint, Plaintiff alleges as follows:

### **PARTIES**

1. Plaintiff Donald Owen Record, II, is domiciled in Berkeley County, State of South Carolina.

1

2. Defendant American Landmark Management, Inc. is a business organized and existing under the laws of the State of Florida, with its principal place of business located at 4890 West Kennedy Blvd., Tampa, Florida 33609. Defendant also maintains offices in Berkeley and Dorchester Counties, South Carolina.

## JURISDICTION AND VENUE

3. This action is brought pursuant to ERISA 29 U.S.C. § 1001, et seq. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

4. Venue is appropriate within this District because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District and in this Division.

## STATEMENT OF FACTS

5. Defendant hired Plaintiff on June 23, 2021, as a Maintenance Supervisor at its residential property located at 10825 Dorchester Rd., Summerville, South Carolina 29485 (the "Property").

6. As set forth in Defendant's Offer Letter to Plaintiff, Plaintiff was entitled to:
   - $30.00 per hour, paid biweekly;
   - "Eligible for monthly bonus based on performance;" and
   - "$75.00 Renewal Bonus Split"

7. Plaintiff's "eligibility" for the bonuses is nowhere defined in the Offer Letter or, upon information and belief, elsewhere.

8. Further, Plaintiff was advised that as part of his compensation package, he would be eligible to access Defendant's employee health benefits plan, for which he would become an active participant sixty (60) days after hire, or August 22, 2021.

9. At all times relevant to this Complaint, Plaintiff and his wife lived in an apartment complex owned by Defendant, pursuant to a written lease.

10. In his capacity as Defendant's Maintenance Supervisor, Plaintiff's responsibilities included but were not limited to the following:

    - Performing maintenance on, in addition to delegation of maintenance duties on, all Property units;

    - Performing maintenance on, in addition to delegation of maintenance duties on, community amenities, including but not limited to Property pool and clubhouse;

    - Coordinating with vendors; and

    - Scheduling turning over of units as residents transition to and from the Property.

11. On or around July 9, 2021, Plaintiff's Assistant Manager was exposed to COVID-19, but continued to report to work despite the known exposure.

12. Plaintiff and his wife were in close contact with the Assistant Manager between July 9 and July 15, 2021, and Plaintiff's wife used the Assistant Manager's pen on July 14, 2021, while the two were talking in the Assistant Manager's office.

13. According to the US Centers for Disease Control ("CDC"), "The incubation period for COVID-19 is thought to extend to 14 days, with a median time of 4-5 days from exposure to symptoms onset."

    https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

14. The Assistant Manager tested positive for COVID-19 on July 15, 2021, and called out of work that morning.

15. If an employee is suspected or confirmed to have COVID-19, the CDC instructs employers to take detailed cleaning and disinfection procedures, and "[i]f there has been a sick person or someone who tested positive for COVID-19 in your facility within the last 24 hours, you should clean AND disinfect the space."

    https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html

16. Despite the Assistant Manager's positive diagnosis and CDC guidance, Defendant failed to thoroughly clean and disinfect the office, model homes, or common spaces, which had been frequented by Defendant's potential residents on tour with the Assistant Manager during the July 9-July 15, 2021 timeframe.

17. According to the CDC, employers should "[i]nform employees of their possible close contact (within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period) with someone with confirmed or suspected [COVID-19] infection in the workplace."

    https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html

18. However, despite knowing of the Assistant Manager's exposure to residents, potential clients, and vendors, along with her positive diagnosis, Defendant failed to advise these individuals of a staff member's positive diagnosis.

19. Despite CDC guidelines stating that "[t]he most protective approach for the workplace is for exposed employees (close contacts) to quarantine for 14 days," on July 15, 2021,

4

Plaintiff's Regional Manager advised Plaintiff that due to his close contact he could **either** continue to work **or** self-quarantine for 14 days (**July 15 to July 29, 2021, the "First Quarantine"**) using available unpaid vacation time and PTO, if he had any, for quarantine compensation.

https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html

20. Plaintiff was entitled to eight (8) hours of paid time off ("PTO") under Defendant's PTO policy during the First Quarantine, but was never paid for same.

21. Plaintiff was later advised by the Property Manager that the Assistant Manager (who, upon information and belief, had exposed Plaintiff to COVID-19), was paid for the entire First Quarantine without having to utilize her PTO or vacation time.

22. On July 25, 2021, eleven (11) days after exposure to the Assistant Manager, Plaintiff's wife began experiencing fatigue and a headache.

23. On Sunday, July 25, 2021, Plaintiff took an at-home COVID-19 test and forwarded the negative results to his Property Manager so that he could return to work. The Property Manager then advised Plaintiff that he was required to have a "lab test" showing negative results.

24. Despite Defendant's knowledge (including Plaintiff's Property Manager) of the First Quarantine period (**July 15-29, 2021**), on **July 26** Plaintiff received a text message from the Property Manager threatening termination for "job abandonment" if he did not produce a doctor's note as a reason for being out of work.

25. The earliest Plaintiff could schedule a "lab test" was Tuesday, July 27, 2021, of which Plaintiff advised his Property Manager via text on July 26, 2021.

26. On July 27, 2021, at 11:30 a.m., Plaintiff received a negative COVID-19 test result from his lab test, and reported to work at 12:15 p.m.

27. On July 28, 2021, Plaintiff's wife, who had been experiencing fatigue and headaches during the First Quarantine, tested positive for COVID-19 with an at-home test.

28. Late at night on July 28, 2021, after Plaintiff returned home from work, he took his wife to the emergency room at Roper St. Francis Hospital in Berkeley County, where she was diagnosed with double COVID-19 pneumonia.

29. On the morning of July 29, 2021, Plaintiff called the Property Manager and advised her that his wife had COVID-19 and that his entire family had to quarantine per instructions from a South Carolina Department of Health and Environment ("DHEC") representative, for fourteen days (**July 29-August 12, 2021, "Second Quarantine"**).

30. On July 31, 2021, Plaintiff and his three stepsons tested positive for COVID-19 using at-home tests, so Plaintiff scheduled a rapid lab test for August 2, 2021 at Walgreens (the earliest available rapid test), the results of which he planned to forward to the Property Manager.

31. On the morning of August 2, 2021, Plaintiff reported to the Property Manager that he had tested positive for COVID-19 with an at-home test and was not feeling well, and that he was scheduled for a rapid lab test at Walgreens later that day.

32. Plaintiff's rapid test results arrived on August 3, 2021, and he immediately provided it to the Property Manager, Defendant's Regional Manager, and Defendant's Human Resources Department.

33. Later on August 3, 2021, Plaintiff received an email from Dana Faith, a property manager of another American Landmark property, indicating that he had been terminated on July 29, 2021 for "job abandonment."

34. Plaintiff contacted Defendant's Human Resources representative, Lucinda Figueroa, to dispute that he had abandoned his job and reiterate that he was having to quarantine due to his COVID-19 diagnosis, but Human Resources refused to acknowledge the positive diagnosis, stating that it was moot since he had been terminated on July 29, 2021.

35. Plaintiff had not been notified of his purported termination on July 29, 2021 and, in fact, was not notified of it until August 3, 2021, the day after Plaintiff notified the Property Manager that he was ordered to quarantine due to instructions from DHEC.

36. Plaintiff's final paycheck reflected he had worked ninety-six (96) hours (sixteen (16) "on call" or overtime hours), but was compensated for only eighty (80) hours.

37. Plaintiff was never compensated for sixteen (16) hours that he performed "on call" work, for which he was to be compensated at an agreed-upon $45 per hour.

38. This nonpayment of earned wages caused Plaintiff's paycheck to be short $720.00.

39. In part because Plaintiff had not been paid for these sixteen hours, or the eight (8) hours of PTO he was entitled to utilize during the First Quarantine, Plaintiff became behind on his rental payments for his apartment owned by Defendant.

40. Upon Plaintiff's termination, Defendant immediately began eviction proceedings against Plaintiff based on the arrearage of the rent.

41. As a result of Defendant's egregious misconduct, Plaintiff has suffered extreme financial hardship and emotional damages.

### FIRST CAUSE OF ACTION
### Violation of ERISA § 510, 29 U.S.C. § 1140 (Interference and Retaliation)

42. Plaintiff restates and realleges the preceding paragraphs in this Complaint as if fully set forth herein verbatim.

43. Section 510 of ERISA states, "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan…or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

44. Plaintiff and his family would have been entitled to participate in Defendant's employee health benefits plan (including short term disability benefits as needed) on **August 22, 2021— ten days after the end of the Second Quarantine, and less than a month after his termination**.

45. Defendants engaged in prohibited and unlawful conduct with they terminated Plaintiff while he was quarantining and recovering from COVID-19 consistent with the protocols and policies set forth by OSHA, the CDC and DHEC.

46. This action was taken with the purpose of interfering with the health care and disability benefits for which Plaintiff and his family would be eligible in mere weeks.

47. Defendants knew that Plaintiff and his family were suffering from COVID-19 at the time they engaged in the prohibited conduct, and interfered with Plaintiff and his family's attainment of health care benefits (as well as Plaintiff's attainment of disability benefits) knowing that they would likely be accessing these benefits immediately upon becoming eligible for and entitled to same to address the short-term and long-term effects of COVID-19.

48. Defendants unlawfully interfered with Plaintiff and Plaintiff's family's entitlement to future benefits when it terminated Plaintiff.

49. Based on their COVID-19 diagnoses, Plaintiff and his family were likely to receive future benefits under Defendant's employee health benefit plan, and Plaintiff was likely to apply for disability benefits under Defendants' disability plan.

50. A causal connection between Plaintiff's termination and the likelihood of he and his family receiving future benefits is established by the fact that he was terminated less than one month before those benefits were to vest.

51. Defendants' purported basis for terminating Plaintiff based on job "abandonment" is pretextual as they were aware that he was actually quarantining and recovering from COVID-19 consistent with the protocols and policies set forth by OSHA, the CDC and DHEC.

52. In terminating Plaintiff, Defendant intentionally interfered with Plaintiff and his family's access to these benefits as participants and beneficiaries of an ERISA-governed plan.

53. As such, Plaintiff prays for the relief set forth below.

**SECOND CAUSE OF ACTION**
**Wrongful Termination in Violation of South Carolina Public Policy**

54. Plaintiff restates and realleges the preceding paragraphs in this Complaint as if fully set forth herein verbatim.

55. S.C. Code § 44-4-530(E) provides that:

    An employer may not fire, demote, or otherwise discriminate against an employee complying with an isolation or quarantine order issued pursuant to [S.C. Code Ann. §§ 44-1-80, 110, 140, or 520-540].

56. Plaintiff was fired in violation of the letter, or at least the implicit clear mandate underlying S.C. Code § 44-4-530(E), while he was recovering from COVID-19.

57. Further, pursuant to S.C. Code § 41-15-510, it is illegal for an employer to:

    discharge or in any manner discriminate against any employee…because of the exercise by such employee on behalf of himself or others of any right afforded by such statutes, rules or regulations.

58. Section 71-112 of the South Carolina Licensing and Labor Relations Division of Labor Regulations ("LLR Regulations") states that:

    employer shall maintain a place of employment which is free of recognized hazards which may cause death or serious physical harm to his employees, and he shall comply with this regulation and other occupational safety and health rules and regulations promulgated under Chapter 15 of Title 41, Code of Laws, State of South Carolina, 1976, as amended.

59. As such, complying with COVID-19 isolation and quarantine protocols outlined by the South Carolina and U.S. Occupational Safety and Health Agency ("OSHA"), the Centers for Disease Control ("CDC"), and DHEC falls within S.C. Code § 41-15-510's general purpose, and is also contemplated in § 71-1012 of the LLR Regulations, which states that while "[c]ertain rights are explicitly provided in the statutes, rules, or

regulations… [c]ertain other rights exist by necessary implication."

60. At all relevant times, SC OSHA's Worker Safety Guidelines prominently set forth in red text that "All businesses must follow SC DHEC and CDC Guidelines, and SC OSHA Standards."

    http://www.scosha.llronline.com/pdfs/2020/SC%20OSHA%20Work%20Re-Entry.pdf

61. SC OSHA states that "Employees should not report to, or be allowed to remain at, work or on a job site if sick or symptomatic." Id.

62. CDC guidance also instructs employers that, with regard to "[e]mployees who appear to have symptoms upon arrival at work or who become sick during the day" that these employees should "immediately be separated from other employees, customers, and visitors, and sent home."

    https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html

63. DHEC guidance recommends that "[p]eople who have symptoms should stay at home until symptoms resolve," and that employers should "ensure your leave policies reinforce this as well as encourage self-isolation when symptoms are present."

    https://scdhec.gov/sites/default/files/media/document/DHEC%20Employer%20Return%20to%20Work%20Guidance_5.5.20.pdf

64. Plaintiff was following OSHA, CDC and DHEC guidelines both for employees who have been exposed to someone with COVID-19 and those experiencing COVID-19 symptoms when he sought medical attention after experiencing same.

65. Defendant terminated Plaintiff for purported "job abandonment" while he was

11

quarantining and recovering from COVID-19 in violation of the public policies set forth by OSHA, the CDC and DHEC.

66. At the time of Plaintiff's termination, Defendant knew that he had not abandoned his job, but was quarantining and recovering from COVID-19 consistent with the protocols and policies set forth by OSHA, the CDC and DHEC. Defendant is directly and proximately liable for Plaintiff's termination.

67. Defendant is responsible for damages to Plaintiff, including lost wages, lost benefits, lost earning capacity, stress and anxiety, pain and suffering, and embarrassment and humiliation.

68. Defendant's tortious conduct was willful, wanton, and reprehensible.

69. As such, Plaintiff prays for the relief below.

## THIRD CAUSE OF ACTION:
### Negligence Per Se

70. Plaintiff restates and realleges the preceding paragraphs in this Complaint as if fully set forth herein verbatim.

71. The actions and conduct of Defendant are in violation of the statutes, regulations, ordinances, codes, guidelines and specifications of the State of South Carolina and the United States of America. Specifically, Defendant's conduct is in violation of state and federal statutes and regulations concerning safe workplaces for employees and rules for requiring employees who were in close proximity or contact with a COVID-19 positive co-worker to quarantine for ten (10) days after the last date of exposure.

72. Defendant's failure to comply with and ensure compliance with all pertinent and applicable regulations, statutes, codes, industry standards, its own policies, and other guidelines and specifications constitutes negligence per se.

73. As a direct and proximate result of Defendant's negligence per se, Plaintiff has suffered the loss of a long-term career with Defendant, and the loss of wages, bonuses, benefits, and other compensation with such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain and suffering, inconvenience, and other non-pecuniary losses.

74. As such, Plaintiff prays for the relief set forth below.

## FOURTH CAUSE OF ACTION:
## Violations of the South Carolina Payment of Wages Act

75. Plaintiff restates and realleges the preceding paragraphs in this Complaint as if fully set forth herein verbatim.

76. SCPWA § 41-10-30(A) requires in part that employers "notify each employee in writing at the time of hiring of the normal hours and wages agreed upon [and] any changes in these terms must be made in writing at least seven calendar days before they become effective."

77. The Offer Letter failed to provide adequate notice to Plaintiff of the wages to which he would be entitled.

78. For instance, the Offer Letter does not define the eligibility/performance requirements for the "monthly bonus based on performance," or on what calculation/formula said bonus was based.

13

79. Additionally, the Offer Letter does not define "Renewal Bonus Split," or the calculation therefor.

80. For these reasons, Defendant has violated the SCPWA § 41-10-30(A).

81. SCPWA § 41-10-40 (C) states that "An employer shall not withhold or divert any portion of an employee's wages unless the employer is require or permitted to do so by state or federal law or the employer has given written notification to the employee of the amount and terms of the deductions as required by subsection (A) of Section 41-10-30."

82. SCPWA § 41-10-50 states that "When an employer separates an employee from the payroll for any reason, the employer shall pay all wages due to the employee within forty-eight hours of the time of separation or the next regular payday which may not exceed 30 days."

83. During the First Quarantine, after being exposed to his coworker that had tested positive for COVID, Plaintiff's Regional Manager required Plaintiff to receive all emergency calls for the Property, and to subsequently reach out to fill-in maintenance technicians while Property maintenance technicians were similarly out on quarantine.

84. Plaintiff was to be compensated at a rate of $45.00 per hour for this "on call" work.

85. However, Plaintiff was never compensated for at least sixteen (16) hours that he performed this work.

86. In fact, his final paycheck reflected that he had worked 96 hours but was only paid for 80.

87. Defendant failed to give Plaintiff seven days written notice of any deductions from his paycheck as required by SCPWA §§ 41-10-40 (C) and 41-10-30.

88. Further, Defendant inexplicably failed to compensate Plaintiff for sixteen (16) hours of documented work within the statutory time period or indeed at all, and has thus violated the SCPWA by making this deduction.

89. Plaintiff requested this payment from Defendant and did not receive a response.

90. By Defendant refusing to pay Plaintiff his earned wages, terminating Plaintiff under false pretenses while he was suffering from COVID-19, which he likely contracted at work due to Defendant's negligence, then immediately instigating eviction proceedings for non-payment, Defendant has willfully violated the SCPWA.

91. For Defendant's willful violations of the SCPWA, Plaintiff prays for the relief below.

**WHEREFORE**, Plaintiff prays for the following relief:

1. Back pay and reinstatement, or front pay in lieu of reinstatement under ERISA;

2. Actual and compensatory damages as determined by the trier of fact;

3. Punitive damages for Defendant's negligence per se;

4. Treble Plaintiff's actual damages for Defendant's willful violations of the SCPWA;

5. Attorney's fees and costs of bringing this action under ERISA and SCPWA; and

6. Such other and further relief as this Court deems necessary, just, and proper.

       **FURTHER, PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

<u>/s/ Casey Martens</u>
Casey Martens, FID 12812
Molly Hamilton Cawley, FID 11838
MHC Law, LLC
460 King St, Suite 200
Charleston, SC  29403
Tel: (843) 225-8651
Casey@mhc-lawfirm.com
Molly@mhc-lawfirm.com

## **VERIFICATION**

I, Casey Martens, declare as follows:

I am one of the attorneys for Plaintiff, and have read the foregoing Complaint with Jury Demand and know the contents thereof. I am informed and believe that the matters stated therein are true and, on that ground, allege the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of October, 2021, at Charleston, South Carolina.

<u>/s/ Casey Martens</u>
Casey Martens